IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALARMAX DISTRIBUTORS, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Civil Action No. 7 cv 1744 |
| ) | |
| TYCO SAFETY PRODUCTS CANADA ) | |
| LTD., ) | |
| Defendants. ) | |

AMBROSE, Chief District Judge

**OPINION**
**and**
**ORDER OF COURT**

Plaintiff AlarMax Distributors, Inc. ("AlarMax")is a wholesale distributor of electronic security products for residential and commercial settings. AlarMax sells products such as burglar alarms, fire alarms and other electronic security products for new installation as well as for maintenance and repair, to installers, alarm contractors and electricians. AlarMax buys from three manufacturers:[1] Napco, Sentrol GE and Defendant Digital Security Controls - which subsequently became a division of Tyco Canada (hereinafter referred to as "Tyco").

In 2000, AlarMax sued Tyco for, among other things, breach of an oral distribution agreement. In June of 2002, the parties reached a settlement agreement ("the Agreement"). AlarMax contends that the Agreement was renewed

---

[1] There is a fourth manufacturer of burglar alarm products, Honeywell. Honeywell sells only through its own wholly-owned wholesale distributor, ADI. ADI is the only electronic security distributor which is national in scope. ADI does not sell Tyco, Napco or Sentrol GE burglar alarm products.

1

on June 28, 2007 with an expiration date of June 27, 2009. The present suit arises out of what AlarMax contends is a breach of that Agreement and a leveraging of Tyco's position in that respect. According to AlarMax, Tyco attempted to force it, and other independent distributors, into accepting a new Distribution Agreement (the "Distribution Agreement"). The new Distribution Agreement would require AlarMax, and the other independent distributors, to become exclusive dealers - to carry only Tyco products.

AlarMax refused to sign the new Distribution Agreement and instead initiated this suit. According to the allegations in the Complaint, were the independent distributors to accede to Tyco's demands in this respect, Sentrol GE and Napco would effectively be shut out of the market. AlarMax explains that both Tyco and Sentrol GE previously attempted to adopt Honeywell's model of distributing their product directly, but ultimately had to abandon this approach. If Tyco succeeds in forcing the independent distributors to become exclusive Tyco distributors, AlarMax reasons, the other manufacturers will have no means of reaching the market. Given that the barriers to entry to the market are high and that the business itself is not in a growth mode, AlarMax contends that Tyco's actions will result in the reduction of competition in the marketplace. On a more specific level, AlarMax also alleges that Tyco has injured AlarMax directly by delaying shipment, by making false claims of credit unworthiness, and by eliminating credit to AlarMax. Consequently AlarMax asserts claims for breach of contract, violation of Count I of the Sherman Act (restraint of trade), violation of Count 3 of the Clayton Act (exclusive dealing),

violation of Count 2 of the Sherman Act (attempted monopolization), and violation of Pennsylvania's common law prohibition on restraint of trade.

Tyco has filed a Motion to Dismiss. <u>See</u> Docket No. [26]. Though Tyco does not challenge the breach of contract claim at this juncture, Tyco does challenge the antitrust claims asserted in Counts II, III, and IV as well as the Pennsylvania common law restraint of trade claim. Essentially, Tyco contends that the federal antitrust claims all fail because AlarMax's product market definition is legally invalid; because AlarMax has failed to plead a cognizable antitrust injury; and because AlarMax has failed to plead an actual agreement. Tyco also urges that the Pennsylvania restraint of trade claim be dismissed because such a claim is not cognizable under Pennsylvania common law.

After careful consideration, and for the reasons set forth below, the Motion is denied.

<u>Standard of Review</u>

In ruling on a motion to dismiss brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, I must construe all allegations of the complaint in the light most favorable to the plaintiff. I must also accept as true all well-pleaded facts and allegations, and must draw all reasonable inferences therefrom in favor of the plaintiff. <u>Worldcom, Inc. v. Graphnet, Inc.</u>, 343 F.3d 651, 653 (3d Cir. 2003). However, as the Supreme Court made clear in <u>Bell Atlantic v. Twombly</u>, __ U.S. __, 127 S. Ct. 1955, 1965 (2007), the "[f]actual allegations must be enough to raise a right to relief above the speculative level." Thus, "a plaintiff's obligation to provide the

'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. (citations omitted).

Analysis

I. Counts II, III and IV - "Relevant Product Market"[2]

As plaintiff, AlarMax bears the burden of establishing the relevant market. Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 436 (3d Cir. 1997). The relevant market consists of both a product market and a geographic market. Tyco has not challenged AlarMax's pleadings with respect to the geographic market.[3] Rather, the focus of Tyco's challenge is the product market.

I recognize that dismissal of antitrust claims may be appropriate in certain cases. See Queen City Pizza, 124 F.3d at 436. Yet it is also true "that in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers." Id., citing, Eastman Kodak Co. v. Image

---

[2] The issue of the "relevant product market" bears upon all three of AlarMax's antitrust claims. For instance, a rule of reason analysis under AlarMax's § 1 claim for restraint of trade requires that I consider the alleged restraint's competitive effect in a well defined relevant market. See ABA Section of Antitrust Law, Antitrust Law Developments (Fifth) Vol. I, p. 525-527. Similarly, with respect to AlarMax's claim under § 2 that Tyco attempted to gain a monopoly, "identification of the relevant market is essential to proving ... attempted monopolization." Id., p. 528 (citations omitted). Finally, AlarMax's § 3 claim of exclusive dealing must be assessed in light of whether Tyco's actions substantially lessened competition or created a monopoly within the relevant market. Id.

[3] The geographic market is "the 'area of effective competition ... in which the seller operates, and to which the purchaser can practically turn for supplies.'" United States v. Philadelphia National Bank, 374 U.S. 321, 359 (1963) (quotation omitted).

4

<u>Technical Services, Inc.</u>, 504 U.S. 451, 482, 112 S. Ct. 2072, 2090 (1992) (emphasis added).

I find further factual inquiry is necessary here to determine the identity of the consumer.

Briefly, as the Third Circuit court has explained, "defining a relevant product market is a process of describing those groups of producers which, because of the similarity of their products, have the ability  actual or potential to take significant amounts of business away from eachother." <u>SmithKline Corp. v. Eli Lilly & Co.</u>, 575 F.2d 1056, 1063 (3d Cir.), <u>cert</u>. <u>denied</u>, 439 U.S. 838 (1978). AlarMax defines the relevant product market as "the sale of burglar alarm products to independent distributors for resale to installers and contractors for residential and commercial settings." <u>See</u> Complaint, ¶ 70. Tyco counters that the relevant product market must also include sales by Honeywell, which sells directly through independent distributors. Both parties advance sound arguments in support of their respective position.

As the Supreme Court has observed, "[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." <u>Brown Shoe Co. v. U.S.</u>, 370 U.S. 294, 325, 82 S. Ct. 1502, 1528 (1962). The Third Circuit adds:

> "Interchangeability implies that one product is roughly equivalent to another for the use to which it is put; while there may be some degree of preference for the one over the other, either could work effectively." ... . Reasonable interchangeability is also indicated by "cross-elasticity of demand between the product itself and substitutes for it." <u>Brown Shoe Co. v. U.S.</u>, 370 U.S. 294, 325, 82 S. Ct. 1502, 1523, 8 L.Ed.2d 510 (1962). As we explained in <u>Tunis Brothers Co., Inc. v. Ford Motor Co.</u>, 952 F.2d 715, 722 (3d Cir. 1991), "products in a relevant

market [are] characterized by a cross-elasticity of demand, in other words, the rise in the price of a good within a relevant product market would tend to create a greater demand for other like goods in that market."

Queen City Pizza, 124 F.3d at 437-38.

Again, however, the key to assessing reasonable interchangeability and cross-elasticity of demand is to consider these issues from the point of view of the buyer. See Queen City Pizza, 124 F.3d at 438 n. 6 (stating, "[c]ross-elasticity of demand is a measure of the substitutability of products from the point of view of buyers.")(emphasis added), quoting, E. Thomas Sullivan and Jeffrey L. Harrison, Understanding Antitrust and its Economic Implications, 217 (1994). Indeed, as recognized by Matt Koehler in *The Importance of Correctly Identifying The Consumer For An Antitrust Relevant Market Analysis*, "in determining if products are interchangeable or are separate product markets, or if a geographic market is appropriate, one is aided by focusing on the consumers of the product or service in question." 67 UMKCLR 521, 526 (Spring 1999). Koehler observed that:

> [p]roperly identifying the customer helps to define a product market because it enables the claimant to show the court the interchangeability factor. The customer is critical because it is the customer that is the flexible element of the "product equation." "Flexible element" is the claimant's ability to show why the product is or is not interchangeable due to the customer's actual or potential purchasing actions. Often it is not the product's characteristics that affect cross-elasticity, because most products are somewhat unique, but rather the customer's buying habits. This makes the product market hinge on the customer's current and past buying tendencies and potential buying trends and provides the necessity to identify the consumer.

Id. at 534.

The Complaint contains allegations indicating that the independent distributors are the "customers." AlarMax contends that the independent distributors constitute virtually the entire market for Tyco, Napco and Sentrol GE. AlarMax has included allegations (referenced above) why this is so - that the manufacturers are unable to employ their own distribution channels, that barriers to entry are high, that it is not a growth industry, et cetera. At this juncture, I will accept these allegations. I am not, however, foreclosing the possibility that the term "consumer" may be so broad as to include installers and electricians and perhaps even homeowners as well. It is unclear at this stage to whom the manufacturers market their products, or who is driving the purchases and thus making the decisions regarding reasonable interchangeability. For instance, if the manufacturers market to the installers and electricians and / or the homeowners, then they should be included in the equation and if Honeywell sells directly to these decision makers then AlarMax's definition of the relevant product market is too narrow. As the pharmaceutical industry litigation has proven,[4] who precisely a consumer is, is fact intensive. If discovery yields results supporting Tyco's definition of the relevant market, I will revisit the issue at the summary judgment stage.

II. Antitrust Injury

Tyco challenges the sufficiency of AlarMax's pleadings regarding antitrust

---

[4] See W.E. 'Ted' Afield, The New Drug Buyer - The Changing Definition of the Consumer For Antitrust Enforcement In The Pharmaceutical Industry, 2001 CLMBLR 203 (2001).

injury. According to Tyco, the federal antitrust claims must be dismissed because AlarMax has not alleged that Tyco's conduct has actually harmed competition and because AlarMax stands to benefit from the alleged exclusive dealing arrangement. At this procedural posture, I must reject Tyco's contentions.

AlarMax does in fact contend that Tyco's conduct has actually harmed competition. See Complaint ¶ 96 (stating that actual competition in the sale of burglar alarm products to independent distribution has been unreasonably restrained; installers and contractors have paid artificially high prices; and Tyco's competitors have been foreclosed from competing on the merits and have been injured in their business and property). Certainly some of AlarMax's allegations are couched in terms of "future harm," yet this phrasing is entirely appropriate based upon AlarMax's request for injunctive relief, which requires only a threat of loss or damage.

Further, AlarMax has also alleged that it has been harmed by Tyco's course of conduct. AlarMax contends that Tyco has delayed shipment, has failed to issue credits and has caused AlarMax to lose a significant customer because of Tyco's position regarding the exclusive distribution agreement. See Complaint, ¶ 45-56. AlarMax's allegations in this regard are sufficient to withstand a Rule 12(b)(6) challenge.[5]

---

[5] Tyco opines that AlarMax would benefit from not signing the new Distribution Agreement because it would lack competition to sell the Napco and Sentrol GE product. This argument ignores AlarMax's allegations that it has already sustained the harm detailed above.

III. Existence of an Agreement

Tyco also argues that the federal antitrust claims must fail because AlarMax has not alleged that an actual exclusive distribution agreement exists. According to Tyco, the Complaint contains nothing more than "conclusory allegations." I disagree. This is not a case where AlarMax is discussing a hypothetical agreement. Rather, AlarMax references a Distribution Agreement with which it was presented and which Tyco informed AlarMax all independent distributors were going to be required to sign in order to continue carrying Tyco products.

AlarMax details the terms of the Distribution Agreement, explaining that it contains Tyco-favored provisions for insurance, indemnification and termination. See Complaint, ¶ 61. AlarMax further explains that the Distribution Agreement would prohibit distributors from selling products made by other manufacturers. Id., ¶ 64. AlarMax also alleges that Tyco indicated that it was requiring all of its distributors to sign this uniform Distribution Agreement. Id., ¶ 62. Further, AlarMax contends that Tyco actually has entered into, and will continue to enter into, Distribution Agreements with other independent distributors. Id., ¶ 84.

These facts raise a reasonable expectation that discovery will reveal evidence of an agreement. See Twombly, 127 S. Ct. at 1965. Consequently, dismissal is not merited.

IV. Pennsylvania Common Law Claim for Restraint of Trade

Finally, Tyco seeks dismissal of AlarMax's restraint of trade claim asserted under Pennsylvania's common law. Tyco cites to numerous cases for the

proposition that neither statutory nor common law antitrust actions for damages exist in Pennsylvania. See Docket No. [26], p. 19, citing, Stutzle v. Rhone-Poulenc SA, No. 002768, 2003 WL 22250424 (Pa. Comm. Pl. Sept. 26, 2003); XF Enters. Inc. v. BASF Corp, 2000 WL 33155746, 47 Pa. D.&C. 4th 147 (Pa. Comm. Pl. 2000); Jules Jurgensen / Rhapsody, Inc. v. Rolex Watch U.S.A., Inc., No. 85-5605, 1987 WL 9276, * 2-3 (E.D. Pa. April 9, 1987). Alarmax concedes that while no Pennsylvania court has yet recognized that a private remedy is available for damages under Pennsylvania's common law of antitrust, injunctive relief is available. See Docket No. [37], p. 20, citing, Collins v. Main Line Bd of Realtors, 452 Pa. 342, 348, 304 A.2d 493, 496 (1973). AlarMax does request injunctive relief. See Complaint, "Relief Requested." Accordingly, I decline to dismiss the claim asserted under Pennsylvania common law in that it appears that AlarMax seeks only injunctive relief.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ALARMAX DISTRIBUTORS, INC.,        )
                                   )
          Plaintiff,               )
                                   )
     vs.                           )        Civil Action No. 7 cv 1744
                                   )
TYCO SAFETY PRODUCTS CANADA        )
LTD.,                              )
          Defendants.              )

AMBROSE, Chief District Judge

ORDER OF COURT

AND NOW, this 27th day of June, 2008, after careful consideration, and for the

reasons set forth in the accompanying Opinion, the Motion to Dismiss (Docket No.

[26]) is DENIED.

It is further ORDERED that a Status Conference is scheduled for July 10, 2008

at 9:30 am.

BY THE COURT:

/s/Donetta W. Ambrose
   Donetta W. Ambrose,
   Chief U.S. District Judge